## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

GREENWICH BOARD OF EDUCATION,

          Plaintiff,

  v.                                                                    3:13-cv-00235 (CSH)

G.M. and J.M., individually and as next
friends of K.M.,

          Defendants.

## RULING ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

HAIGHT, Senior District Judge:

      Plaintiff, the Greenwich Board of Education (the "Board"), brings this action against Defendants G.M. and J.M. ("Parents"), individually and as next friends of their daughter, K.M. ("Student"). The Board brings suit pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482 ("IDEA"), to appeal a decision and order (the "Order") of an independent hearing officer (the "IHO") of the State of Connecticut's Department of Education. Specifically, the Board filed suit under § 1415(i)(2) of the IDEA, which grants the right to bring a federal civil action to certain parties claiming to have been aggrieved by the IDEA's dispute resolution process. The parties have cross-moved for summary judgment. Docs. 43-50. This Ruling resolves both motions.

## I.        Background

      K.M. is a student at the Windward School ("Windward"), a specialized instruction private school in White Plains, NY. K.M. began at Windward in the second-grade in the 2012-13 academic year. For kindergarten and first-grade, K.M. attended Riverside Elementary School ("Riverside"), a Greenwich, CT public school falling under the jurisdiction of the Plaintiff Board. K.M.'s transition from Riverside to Windward is the focus of the instant dispute.

During K.M.'s kindergarten year at Riverside, Parents became concerned about K.M.'s ability to "follow multi-step instructions," a concern that arose mostly in light of a family history of learning disabilities. J.M. Tr.[1] at 18-19. In August of K.M.'s first-grade year at Riverside, Parents expressed concerns to K.M.'s teacher, Sheri McGowan, through a "getting to know you interview" form. J.M. Tr. at 21. Parents mentioned to McGowan their worries given a family history of learning disabilities, and asked McGowan to monitor closely K.M.'s progress. McGowan Tr. at 178-89.

By October of first-grade, Parents began to notice that reading simple books was "an enormous struggle" for K.M. J.M. Tr. at 21. On November 7, 2011, Parents expressed these concerns to McGowan in an e-mail and requested an in-person meeting. P-11.[2] At that meeting, on November 9, 2011, McGowan indicated to Parents that she had referred K.M. to the school's Student Assistance/Response to Intervention Team ("SAT/RTI"). J.M. Tr. at 25; P-25; P-33. McGowan testified as to why she referred K.M. to the SAT/RTI team:

> The SAT team is a team of teachers and administrators that are there to help come up with other strategies that you can use and additional ways of going about teaching things and ways of assessing and collecting data and so forth. So I brought [K.M.] to this SAT team knowing that there were parent concerns and learning disabilities in the past, wanting to make sure there were more eyes and everyone was – you know, on that team was aware of what I was doing and able to suggest anything if they saw the need to do so.

McGowan Tr. at 68. Although McGowan testified that had J.M. not expressed concerns, she

---

[1]  "Tr." refers to the transcript of testimony provided at the due process hearing in front of the IHO over five days on October 2, October 5, October 23, October 24, November 28, and December 4, 2012.

[2]  References to P-[] and B-[] refer to the Parents' and Board's hearing exhibits, respectively, filed with the Court under seal. References to A-[] refer to what the Board describes as the "Hearing Officer Record of Communications, Scheduling Notices, Briefs, Final Decisions, and Order," also filed under seal.

"probably [would] not [have referred K.M. to SAT/RTI] so soon," she made clear that K.M. would likely have nevertheless been referred to SAT/RTI at some point.  McGowan Tr. at 180, 200-01. However, McGowan testified that "the history of learning disability which [J.M.] shared . . . was the major factor" for her referral.  McGowan Tr. at 183.

The SAT/RTI Team met on November 21, 2011 to craft an "intervention plan" for K.M.  B-5, at 22.  The plan was modeled as a "scientific research-based intervention," or "SRBI," and was structured pursuant to Connecticut's "Using Scientific Research-Based Interventions:  Improving Education for All Students; Connecticut's Framework for Response to Intervention."  Doc. 44, at 6; Supp.-8.[3]  The initial objectives of the SAT/RTI Team's SRBI plan were two-fold: (i) "To increase [K.M.]'s consistent use/recognition of sight words"; and (ii) "To go up one F/P[4] level through direct strategy instruction."  B-5, at 22.  The plan included K.M.'s meeting with Lynn Sterner, Riverside's Reading Specialist, three times a week for thirty minute sessions,[5] and for daily sight word practice three times daily.  B-5, at 22.  After the meeting, Parents followed up with Marianne McCullough, Riverside's Assistant Principal, about the details of the intervention plan.  McCullough informed Parents that K.M. "is in the expected range for her grade level and [that] we are intervening early in

---

[3]  "Supp.-[]" refers to the documents that the parties jointly filed as the "Supplemental Administrative Notice Documents."  *See* Doc. 30.

[4]  "F/P" stands for the Fountas and Pinnell Benchmark Assessment System, which "consists of a series of carefully designed benchmark books that measure the level of difficulty at which a student is able to read fiction and nonfiction texts.  The books range in difficulty from those for beginning readers (A) to those for advanced readers (Z)."  A-1.

[5]  Although Parents were initially told these sessions would be four times a week, B-5, at 22, they were notified on December 9, 2011 that K.M. was actually being referred for three weekly sessions, not four, and that the indication of four in the initial plan was a mistake.  J.M. Tr. at 41; P-14; *see also* Sterner Tr. (10/24/12) at 95 ("It was three times a week, not four. . . . [T]hat's a definite.").

light of the concerns you raised to support [K.M.]." B-6, at 1. Parents were also informed that they

would be updated by letter following each SAT/RTI Team meeting. P-14; J.M. Tr. at 39.

K.M. met with Sterner for the first time on November 28, 2011. Sterner Tr. (10/24/12)[6] at

137. In a letter dated December 5, 2011, Sterner formally notified Parents that K.M.

> has been selected to participate in Leveled Literacy Intervention, or
> LLI. He[7] will have daily thirty-minute lessons during which he will
> read, write and learn about phonics. The LLI lessons are given in
> addition to the regular reading instruction your child receives in the
> classroom.

P-2, at 1. Sterner testified that she viewed K.M.'s referral to LLI as unusual because K.M. "was on

grade level, and I don't usually see children on grade level." Sterner Tr. (10/24/12) at 89. In fact,

Sterner testified that the usual criterion for LLI is "[t]wo levels below the benchmark reading level,"

and that K.M. was selected nonetheless purely "due to parental concern." Sterner Tr. (11/28/12) at

22. Sterner sent Parents periodic updates regarding K.M.'s progress in the LLI program. P-2, at 2-

17. It was Sterner's position that K.M. was progressing properly through LLI. Sterner Tr. (10/24/12)

at 127 ("what we were doing was working").

At the end of December, Parents hired a private reading tutor for K.M., whom K.M. met with

regularly through the end of her first-grade year and into the summer.[8] P-1. Parents informed

Riverside that they had hired such tutor, and were also in regular contact with the school throughout

the year sharing their concerns of K.M.'s lack of reading progress. *See* P-3.

---

[6] Sterner's testimony stretched over two days, October 24, 2012 and November 28, 2012.

[7] This was clearly a form letter, evidenced best by the improperly gendered pronouns.

[8] K.M. met with two different private tutors, one in the month of December 2011, and the other from January through August 2012. *See* P-1.

On January 30, 2012, John Grasso, principal of Riverside at the time, sent a letter to Parents updating them on K.M.'s SAT/RTI intervention plan.  The letter stated that K.M. "has shown inconsistency in her ability to recognize sight words and high frequency words," and that "[t]o help her we will increase the amount of times she practices these words in school.  She will have three opportunities each day to practice with:  the teacher, a peer, and with the whole class."  P-34.

It was clear that Parents did not believe Riverside's intervention with K.M. was eliciting sufficient progress.[9]  In light of this concern, Parents hired Dr. Jill Greenberg, a private psychologist with a Ph.D. in school psychology and an undergraduate degree in special education, to assess K.M. Greenberg Tr. at 84.  J.M. explained why Parents hired Dr. Greenberg:

> We felt, throughout the entire school year, that [K.M.] was receiving additional support, but we didn't feel like she was getting the support she needed, because we did not see any progress, and we felt like we needed a diagnosis, in order to correctly help [K.M.]. . . .  We didn't feel [K.M.] was getting the help that was going to help [her] going forward, so we felt like we needed a diagnosis to find out what exactly was wrong, or why she couldn't read.

J.M. Tr. at 80.

On March 27, 2012, Parents authorized Dr. Greenberg to receive from Riverside "any evaluations, assessments or other paperwork necessary for Dr. Greenberg to complete her evaluation" of K.M.  B-2, at 1. Dr. Greenberg then evaluated K.M. between April and May 2012, meeting with her for six private test sessions, performing a multitude of tests, and observing her in school and at home.  Dr. Greenberg then issued a comprehensive twenty-page psychological report

---

[9]  For example, Parents responded to Grasso's January 30, 2012 letter, stating that "[w]e wanted to bring to your attention that the updated plan [described in Grasso's letter] is identical to the original plan and has not been a successful path for [K.M.]." B-6, at 15.

of K.M.[10]  In short, Dr. Greenberg determined that K.M.'s "current functioning meets the diagnosis of Specific Reading Disorder, ADHD-combined type, and generalized anxiety." B-3, at 18.  The report stated that K.M.

> demonstrates clear signs of a specific reading disorder as well as signs of ADHD.  Despite strong, evenly developed cognitive functioning, including memory functioning and processing speed functioning, intensive intervention at school and tutoring at home, [K.M.]'s reading skills fall well below the expected level for her age.

B-3, at 15.  In fact, Dr. Greenberg testified that, given her testing results, K.M.'s reading disorder was "just standing there yelling at me."  Greenberg Tr. at 28; *see id.* at 27 ("[s]he was way below average. Below end of low average.  She was way low").  Dr. Greenberg also expressly disagreed with what she viewed to be "atypically positive" reviews of K.M. given by K.M.'s teacher.  Greenberg Tr. at 36, 102 ("this teacher's responses don't make sense to me").  She then testified that "we should intervene intensively now because it won't get better by itself."  Greenberg Tr. at 80.  However, Dr. Greenberg acknowledged that her report represented a snapshot of K.M. and that she did not consider K.M.'s progress throughout her first-grade year.  Greenberg Tr. at 88, 141-42.  Dr. Greenberg also acknowledged that she did not meet with K.M.'s teacher despite the fact that she would do so "in the ideal setting."  Greenberg Tr. at 90-91, 103; *see also id.* at 140 ("Normally I work pretty closely with the school and the teacher if I can.  I don't know why I didn't in this case.").  Dr. Greenberg also did not meet with K.M.'s reading specialist or the school psychologist, nor did she observe K.M. during her specialized reading group.  Greenberg Tr. at 90-91, 111.

In light of Dr. Greenberg's findings, on June 12, 2012, Parents sent then-Principal Grasso a

---

[10]  The version of the report contained in the record, B-3, is both undated and unsigned. However, J.M. testified that Dr. Greenberg completed her report prior to the Parents' June 12, 2012 referral of K.M. for a special education determination.  J.M. Tr. at 101.

Referral to Determine Eligibility for Special Education and Related Services with respect to K.M. Parents requested that a "referral PPT be scheduled prior to the end of the school year." B-6, at 36. A "PPT," or a "planning and placement team," is a body comprised of school officials and others structured pursuant to Connecticut law (and the IDEA) to make determinations with respect to the special educational needs of students. Regs. Conn. State Agencies § 10-76a-1(14). The referral request documented three specific areas of concern: (i) reading struggles; (ii) anxiety and self-confidence issues; and (iii) attention and focus issues. B-6, at 37. J.M. testified that Parents referred K.M. for a special education eligibility determination because "[a]fter we got a diagnosis that was more accurate for [K.M.], we wanted to get a more specific instruction for her to meet her needs." J.M. Tr. at 102.

On June 19, 2012, the PPT met to consider Parents' referral. Present at the meeting were: (i) Parents; (ii) Assistant Principal McCullough; (iii) regular education teacher McGowan; (iv) special education teacher Diane Rasweiler; (v) school psychologist June Gold; (vi) Diane Anison (referred to as "Speech/Lang" on the meeting minutes); (vii) Director of Special Education Mary Forde; (viii) Riverside reading specialist Sterner;[11] (ix) Dr. Greenberg; and (x) Parents' Attorney Gerry McMahon. B-1, at 2. The PPT had before it Dr. Greenberg's evaluation, information from SAT/RTI, K.M.'s Fountas and Pinnell results, sight word documentation, and report cards. McCullough Tr. at 31-32. At the meeting, "[e]ach team member gave input on their specific area with [K.M.]." McCullough Tr. at 32. Dr. Greenberg and Parents also gave their input at the meeting. McCullough Tr. at 32-33.

---

[11]  Sterner's name does not appear on the minutes from the PPT meeting, but it is clear that she was in attendance. *See* J.M. Tr. at 107; Sterner Tr. (11/28/12) at 29.

Following the PPT meeting, and without conducting any further evaluation, the PPT deemed K.M. ineligible for special education and related services because she "has responded to the current level of interaction." B-1, at 3. The PPT's analysis, reflected in the meeting minutes, is reproduced in full below:

> Introductions were made. Parent received procedural rights/safeguards. Parents signed 5-Day Waiver and Notice and Consent to Conduct an Evaluation. The purpose of the meeting was to review the parent referral for special education eligibility and consider the initiated private evaluation. - Classroom teacher described [K.M.]'s reading performance to date. Currently [K.M.] is reading independently at a Fountas & Pinnell level H (benchmark range at this time of year is I, J, K). [K.M.] began the year reading independently at level B. Classroom teacher reported that [K.M.] knew 100 out of 110 first grade sight words – grade level benchmark is 88. Reading specialist described her sessions with [K.M.]. She gave parents a list of books for [K.M.] to practice for fluency over the summer. School psychologist reported that [K.M.] demonstrates strong social skills at school and was selected as a model for a snack group. - Parents described [K.M.] as anxious at home and very stressed about reading. They shared that [K.M.] has a tutor from Windward twice a week. The private evaluator reported that [K.M.] presents as a cognitively intact child with executive functioning issues who shows herself differently at home than at school. She noted a weakness in far point copying, reversals, and negative emotions around reading. School based team recommended that [K.M.] attend GPS Summer School to maintain her skills in a more relaxed thematic based learning environment. Parents were encouraged to contact the assistant principal if they wanted to visit summer school. - Team agreed that [K.M.]'s performance would be monitored as she enters second grade. A parent meeting will be scheduled early in September. Progress monitoring data will be graphed and shared regularly with parents. The school members of the team considered the private evaluation, her response to intervention, and current functioning and determined that [K.M.] does not meet the criteria for disability under the IDEA.

B-1, at 3. Assistant Principal McCullough, the PPT administrator, testified as to why she personally believed that K.M. was ineligible for special education services:

> Looking at all of the information in front of the team, her response to intervention was part of the decision-making and her performance throughout the course of the year in conjunction with the report and everybody's input. . . .   She responded very positively to intervention. That she had started the year at a level B and was ending the year at a level H, which is seven levels.

McCullough Tr. at 33.  McCullough then acknowledged that level H was below grade level, but that this was not a concern meriting a determination that K.M. was disabled:

> It factored in because it was the first time they are monitoring that she hadn't made the range and at the meeting it was described that there was a jump from H to I and that as such, while it was going to be something closely monitored with [K.M] in second grade, we didn't know if it was the beginning of a trend or just one piece of information.

McCullough Tr. at 34; *see also* Sterner Tr. (11/28/12) at 29.  McCullough made clear her view that it was K.M.'s progress that demonstrated her ineligibility for special education services.  McCullough Tr. at 36 (testifying that K.M.'s case was different from other PPTs in which a disability was found because K.M. "was making measurable consistent progress throughout the year.").

Parents elected not to enroll K.M. in the summer program recommended by the PPT.  J.M. Tr. at 129.  J.M. explained this decision: "[W]e thought it would be more of the same instruction, and we didn't believe that that instruction was helpful for [K.M.], and we needed something that was more specific to her needs."  J.M. Tr. at 130.  Rather, immediately after the PPT meeting, Parents began efforts to transition K.M. from Riverside to Windward.  In fact, the day of the meeting, J.M. authorized Riverside to release K.M.'s information to Windward.  P-12; J.M. Tr. at 125.[12]

J.M. initially became familiar with Windward through the experience of her niece, who had

---

[12]  J.M. executed the Windward release on the same day of the PPT meeting.  P-12.  As aptly noted on cross-examination, J.M. must have requested this document from Windward prior to the PPT.  J.M. Tr. at 161.

previously been a student at Windward.  J.M. Tr. at 136.  Windward was also recommended by Dr. Greenberg.  J.M. Tr. at 136, 161.  Although Dr. Greenberg did not have much of a relationship with Windward, she "know[s] many people who have sent their children there," meaning that she "just know[s] of it by reputation."  Greenberg Tr. at 59-60.  She opined that "[i]t's a great school for kids who do not have behavior problems, who are bright and really struggling to learn to read."  Greenberg Tr. at 60.  In short, Dr. Greenberg testified that Windward is "a great choice for K.M."  Greenberg Tr. at 60.  She testified why this is so:

> Not only is [K.M.] bright and lively minded, she is struggling to learn to read, and she's very anxious about that.  And my hope would be that in a small group setting where there's lots of reinforcement all day long in literacy, because that's the focus all day long. . . .  At the same time, they're really focusing on the emotional piece because they know kids who are – who have learning disabilities have emotional vulnerabilities as well, so their program is nicely set to address that throughout the day. . . . [T]here's a concerted effort at Windward to teach kids not just self-advocacy skills, but to know who they are as learners with a learning disability.

Greenberg Tr. at 60-61.[13]

Riverside school psychologist June Gold, a participant in the PPT meeting, testified that she disagreed with certain of Dr. Greenberg's diagnosis.  Specifically, she testified that K.M. had a positive attitude towards school, that she did not detect any anxiety (nor did any school staff report to her any anxiety), and that K.M. was "focused, very much on task," and demonstrated no signs of ADHD or attention issues.[14]  Gold Tr. at 8-10.  However, Gold acknowledged she conducted no

---

[13]  Dr. Greenberg also testified that there are not many options for schools that provide the services of Windward.  Greenberg, at 75 ("there's slim pickin's around here, so the choices are Windward and Eagle Hill").

[14]  The record appears to show that there was likely a discrepancy between K.M.'s performance at school compared with at home.  McGowan testified that K.M. "enjoys reading," and "loved to read" (although she acknowledged that K.M. had certain reading weaknesses and

evaluations of any type of K.M. Gold Tr. at 16. In fact, she testified that "we didn't see the need [to evaluate K.M.] at the school level [because] [s]he was responding to intervention." Gold Tr. at 26.

Windward performed an initial educational screening of K.M. on June 22, 2012. P-13. Windward's testing found K.M. to be below grade level in rate, accuracy, fluency, and comprehension, and informed Parents that it would accept K.M. for the 2012-13 academic year. J.M. Tr. at 127-28; P-19. Parents executed a Windward enrollment contract on July 1, 2012. P-10; J.M. Tr. at 128. On July 12, 2012, Parents, through counsel, notified the Connecticut State Department of Education that they were filing for a due process hearing pursuant to the IDEA to challenge the PPT's determination. A-1. On August 13, 2012, Parents informed Riverside Principal Christopher Weiss that K.M. would be attending Windward instead of Riverside for the 2012-13 academic year. B-6, at 46. K.M. began at Windward on September 10, 2012. J.M. Tr. at 128.

After beginning second-grade at Windward, Parents retained the services of Dawn Matera, a reading specialist with a master's degree in special education, to evaluate K.M. P-20. Matera performed a "one-hour curriculum-based assessment [of K.M.] in [her] office" on September 28, 2012. Matera Tr. at 153. Matera had access to Dr. Greenberg's report and certain of K.M.'s school records. Matera ultimately issued a two-page report, concluding that K.M. was in the 10th percentile for end of first-grade readers—meaning she did not meet the first-grade benchmark (as a second-grader)—as to "word reading" and "fluency." Matera also concluded that "[s]ince we know that her working memory and cognitive processing speed are at or above grade level, we can consider [K.M.]'s difficulties to be the result of her reading disorder, attentional difficulties, or anxiety." P-

---

inconsistencies in which her progress was slow). *See* McGowan Tr. at 43, 58, 62, 127, 147, 162, 186, 188. McGowan also did not view K.M. as exhibiting the anxiety described by Parents. McGowan Tr. at 163.

24, at 2.

The due process hearing challenging the PPT's determination took place in front of the IHO over six days on October 2, October 5, October 23, October 24, November 28, and December 4, 2012. Testifying at the hearing were: (i) J.M.; (ii) McGowan; (iii) Dr. Greenberg; (iv) Matera; (v) Sterner; (vi) Gold; and (vii) McCullough. Ultimately, the issues for resolution were: (i) "Did the Board err in concluding that the Student was ineligible for special education?"; and (ii) "If so, is the Parents' unilateral placement at Windward School appropriate and reimbursable?" The parties submitted post-hearing briefing on December 13 and 14, 2012.

On January 3, 2013, the IHO issued her decision, ruling in favor of Parents on both issues. In summary, the IHO determined that: (i) the Board erred in summarily denying Parents' request without evaluating K.M.; (ii) K.M. is eligible for special education under the category of "specific learning disability," 34 C.F.R. § 300.8(c)(10), and thereby the Board failed to offer K.M. a "free-appropriate public education" as required by the IDEA; and (iii) Windward was an appropriate unilateral placement entitling Parents to reimbursement. The Board moved for clarification on January 30, 2013, which the IHO summarily denied on February 4, 2013. On February 21, 2013, the Board filed the instant Complaint in this Court to appeal the IHO's determination.

## II.    Standard of Review

IDEA appeals are generally resolved in full via cross-motions for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. However,

> Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment motion. . . . Basing its decision on the preponderance of the evidence, the court is required to grant such relief as the court determines is appropriate.

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (internal quotations, citations, and alterations omitted).  The "preponderance of the evidence" standard comes directly from the IDEA itself.  20 U.S.C. § 1415(e)(2) ("basing its decision on the preponderance of the evidence, [the district court] shall grant such relief as the court determines is appropriate").  Accordingly, "'a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA.'"  *Id.* at 225-26 (quoting *Lillbask es rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

Finally, in determining whether a state agency's decision as to a local education agency's compliance with the IDEA is supported by a preponderance of the evidence, the court should keep in mind that

> '[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.' *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007) (internal quotation marks omitted).  The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.' *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (internal quotation marks, ellipses, and brackets omitted).  The deference owed depends on both the quality of the opinion and the court's institutional competence.  *Id.*

*C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014).

## III.    Discussion

### A.    *Burlington/Carter*

The process of review of a state agency's determination as to parents' entitlement to reimbursement for a private placement under the IDEA is a familiar one:

> When parents unilaterally enroll their child in a private school, we

> apply the three-part *Burlington-Carter* test to determine whether they should be reimbursed.  Under the test, we look at '(1) whether the school district's proposed plan will provide the child with a free appropriate public education [("FAPE")]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities.'

*J.C. v. New York City Dep't of Educ.*, – F. App'x –, 2016 WL 1040160 (2d Cir. Mar. 16, 2016) (quoting *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014)).[15]  The Court turns to the *Burlington/Carter* elements now.

### 1.     IHO's Determination That the Board Failed to Offer K.M. a FAPE

"A state receiving federal funds under the IDEA must provide disabled children with a free and appropriate public education ("FAPE")."  *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012); 34 C.F.R. § 300.101(a) (a FAPE "must be available to all children residing in the State between the ages of 3 and 21").  Moreover, states share an affirmative responsibility that "[a]ll children with disabilities in the State . . . who are in need of special education and related services, are identified, located, and evaluated." 34 C.F.R. § 300.111(a)(1)(i). This is referred to as the state's "Child Find" obligation, which expressly requires the state to evaluate any "[c]hildren who are suspected of being a child with a disability." 34 C.F.R. § 300.111(c)(1). Connecticut regulations contain the same requirement.  Regs. Conn. State Agencies § 10-76d-6.

When a school board violates its Child Find obligation by not evaluating a child suspected of being disabled, it necessarily fails to provide that student a FAPE.  *See Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. and Mrs. M.*, 2009 WL 2514064, at *13 n.8 (D. Conn. Aug. 7, 2009) ("District

---

[15]  The Second Circuit's phrase "*Burlington-Carter* test" refers to the Supreme Court decisions in *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985) and *Florence County School District Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993).  *See Frank G. v. Board of Educ. of N.Y.*, 459 F.3d 356, 363-64 (2d Cir. 2006).

No. 9's failure to satisfy its IDEA obligations resulted in the loss of an opportunity to provide a FAPE"); *M.A. v. Torrington Bd. of Educ.*, 980 F. Supp.2d 245, 270 (D. Conn. 2013) ("The Board's 'refusal to continue the process for [M.A.], a resident of Torrington, constituted a denial of FAPE." (internal quotation omitted)).

Largely in light of K.M.'s reading difficulties, Parents claimed that K.M. suffers from "a specific learning disability," which the IDEA defines as follows:

> [A] disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain disfunction, dyslexia, and developmental aphasia.

34 C.F.R. §§ 300.8(a)(1) & (c)(10). The IDEA then describes how a school board may determine the existence of a "specific learning disability":

> (a) [A school] may determine that a child has a specific learning disability if . . .
>
> (1) [t]he child does not achieve adequately for the child's age or to meet State-approved grade-level standards in one [one of a number of] areas, when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards[; and]
>
> (2)(i) The child does not make sufficient progress to meet age or State-approved grade-level standards in one or more of the areas identified in paragraph (a)(1) of this section when using a process based on the child's response to scientific, research-based intervention; or
>
> (2)(i)(i) The child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments.

-15-

34 C.F.R. § 300.309(a).

However, the IDEA does not provide all of the procedures a state must follow. Rather, it requires that states "must adopt, consistent with § 300.309, criteria for determining whether a child has a specific learning disability," and that state "public agenc[ies] must use th[at] State criteria . . . in determining whether a child has a specific learning disability." 34 C.F.R. § 300.307. Connecticut has adopted certain of such criteria through Regs. Conn. State Agencies § 10-76 (2012). Specifically, § 10-76d-9 states that "[t]he following criteria shall be used to determine if a child is a child with a learning disability":

> (1) (A) The child does not achieve adequately for the child's age or meet state-approved grade-level standards in one or more of the following areas when provided with learning experiences appropriate for the child's age or state-approved grade-level standards . . .
>
>> (i) oral expression;
>> (ii) listening comprehension,
>> (iii) written expression,
>> (iv) basic reading skills,
>> (v) reading fluency skills,
>> (vi) reading comprehension,
>> (vii) mathematics calculation, or
>> (viii) mathematics problem solving;
>
> (B) The child does not make sufficient progress to meet age or state-approved grade-level standards in oral expression, listening comprehension, written expression, basic reading skills, reading fluency skills, reading comprehension, mathematics calculation, or mathematics problem solving when using a process based on the child's response to scientific, research-based intervention: and
>
> (C) The child's learning difficulties are not primarily the result of a visual, hearing or motor disability, an intellectual disability, emotional disturbance, cultural factors, environmental or economic disadvantage, or limited English proficiency; . . .

*     *     *

Here, it is undisputed that the Board did not conduct a comprehensive evaluation of K.M. *See*, *e.g.*, Doc. 50, at 9 ("Undisputedly, a comprehensive evaluation did not exist in this case"); Doc. 44, at 23 ("An evaluation of the Student was neither necessary nor appropriate"). Rather, the PPT made a summary determination that K.M. was not disabled as a matter of law. The Board therefore does not contest on appeal the IHO's determination that the PPT, "*without evaluating the Student*, summarily deemed her ineligible for special education and related services," Order, at 7 (emphasis added). Instead, the Board argues the "IHO erred in finding that the Board was obligated to evaluate the Student under the formal evaluation procedures provided for under the IDEA." Doc. 44, at 22. The issue before the Court is therefore whether the IHO's decision that the Board erred in refusing to comprehensively evaluate K.M. for a specific learning disability is supported by a preponderance of the evidence.

The Board argues that it was not required to conduct a comprehensive evaluation pursuant to the IDEA because K.M. purportedly made "sufficient progress" through SRBI. To support this assertion, the Board relies on what it terms a "dual discrepancy" analysis, arguing that a PPT may only find a student disabled under the IDEA if "the student (1) does not achieve adequately for the child's age or meet state-approved, grade-level standards in one or more areas, *and* (2) does not make sufficient progress to meet age or state-approved, grade-level standards . . . when using a process based on the child's response to [SRBI]." Doc. 44, at 20 (internal quotation omitted). In other words, the Board argues that "a PPT may decline to evaluate a student where the student is making progress in the SRBI process and thus there is no reason to suspect a disability." Doc. 44, at 23. The Board then argues that it "had no reason to suspect that [K.M.] had a disability, as [she] made

-17-

sufficient progress through the [RTI] program."  Doc. 50, at 3.

The Board's argument that K.M.'s purported progress through SRBI obviated the need for a comprehensive disability evaluation does not conform to the requirements of the IDEA.  As stated, the IDEA requires school boards to evaluate "[c]hildren who are *suspected of* being a child with a disability." 34 C.F.R. § 300.111(c) (emphasis added); *see also Murphy v. Town of Wallingford*, 2011 WL 1106234, at *3 (D. Conn. Mar. 23, 2011) ("[o]nce a school has 'reason to suspect a disability,' the school must conduct an evaluation of the child"); *Regional Sch. Dist. No. 9 Bd. of Educ.*, 2009 WL 2514064, at *12 ("In order to establish a procedural violation of the Child Find obligation, the school officials must have[, *inter alia*,] 'overlooked clear *signs* of disability,'"(quoting *Bd. of Educ. v. L.M.*, 478 F.3d 387 (6th Cir. 2007) (emphasis added)).  Accordingly, even crediting the Board's argument that K.M. must have been found "dual discrepant" to be disabled under the IDEA, *see infra*, the Board would have had to show that the PPT had no reason to suspect that K.M. was not making "sufficient progress" following SRBI.

However, there can be no serious question as to whether Parents offered sufficient evidence to at least raise a suspicion that K.M. *may* have been failing to make "sufficient progress" through SRBI.  At the outset, they offered a report and testimony by an unchallenged expert in the field who conducted a myriad of research-based examinations, met with K.M. on six separate test sessions, and determined unhesitatingly that K.M.'s "reading skills," after months of SRBI, "fall well below the expected level for her age."  Greenberg, at 15.[16]  This is despite the fact that, according to the Riverside reading specialist, K.M. was on grade level at the beginning of the year.  Sterner Tr.

---

[16]  Although Dr. Greenberg did not evaluate K.M.'s progress throughout K.M.'s first-grade year, her conclusion that K.M. is "well below the expected level for her age" is certainly relevant as to whether SRBI had been serving its function.

(10/24/12), at 89.  It is also of note that Dr. Greenberg determined that K.M.'s lack of progress is a product of K.M. "meet[ing] the diagnosis of Specific Reading Disorder, ADHD-combined type, and generalized anxiety."   The Board offered no credible evidence or testimony to contradict the substantive findings of Dr. Greenberg.[17]

The Board argues that reliance on Dr. Greenberg's report was inappropriate in light of the fact that Dr. Greenberg purportedly did not apply, nor even refer to, the IDEA statutory or regulatory process for determining if a child has a "specific learning disorder."   However, whether Dr. Greenberg specifically applied or incorporated IDEA standards into her diagnosis is not dispositive of whether her ultimate findings should have raised a *suspicion* of disability.  As stated elsewhere:

> District No. 9 argues that the fact that M.M. was admitted to a psychiatric hospital does not necessarily mean that she would qualify for special education.  *However, the standard for triggering the Child Find duty is suspicion of disability rather than factual knowledge of a qualifying disability.*

*Regional Sch. Dist. No. 9 Bd. of Educ.*, 2009 WL 2514064, at *12 (emphasis added).

Moreover, Dr. Greenberg's report was far from the only sign that should have led to a suspicion that K.M. may not have been making sufficient progress through SRBI.  K.M. dropped from at grade-level to below grade-level in reading skills—the specific area in which Parents claim K.M.'s disability manifests itself—during the year with which SRBI took place, a fact expressly acknowledged by the PPT.  Ex. B-1 ("Currently Kiera is reading independently at a Fountas & Pinnell level H (benchmark range at this time of year is I, J, K)"); *see also* McCullough Tr. at 34; Sterner Tr. (11/28/12) at 29.  That below grade-level performance was observed despite the fact that

---

[17]   Although the Board proffered testimony from Riverside personnel who seemed to disagree with certain of Dr. Greenberg's conclusions, *see, e.g.*, McCullough, at 47; McGowan, at 165, 194, none of these witnesses actually evaluated K.M, or are trained to do so.

K.M. entered the LLI program on grade-level. *See* Sterner Tr. (10/24/12), at 89. K.M.'s June 2012 report card also indicated a regression between March and June 2012 in "Strategic Reading," dropping from "meets the grade level standard for most learning objectives," to "meets the grade level standard for some learning objectives and is below the grade level standard for most learning objectives." B-4, at 1-3. In addition, then-Principal Grasso's January 30, 2012 update to Parents regarding necessary increases to K.M.'s SRBI makes clear that Riverside itself viewed the initial phases of SRBI not to be sufficiently corrective. P-34. Perhaps most telling is that even PPT members, including the meeting's administrator, acknowledged K.M.'s drop below grade-level on the F&P in their testimony at the due process hearing and that it could not be ruled out as a cause for concern. McCullough Tr. at 34 ("it was going to be something closely monitored with [K.M] in second grade, *we didn't know if it was the beginning of a trend* or just one piece of information" (emphasis added); McGowan Tr. at 194 ("there's *no way to know* if that was just a little slip"); Sterner Tr. (11/28/12) at 29 ("At the end of the school year there was a dip. And that of course we were taking seriously") (all emphases added).[18] Notably, K.M.'s first-grade teacher and PPT member, McGowan, could not even definitively state one way or the other whether she thought K.M.'s lack of progress warranted an eligibility *determination*, McGowan Tr. at 193 ("[t]hat's a hard question"), let alone an eligibility *evaluation*. This goes to demonstrate that not only *should* the PPT have had a suspicion that K.M. was making insufficient progress through SRBI, but that they actually may have *had* such a suspicion.

---

[18] This "wait-and-see" approach also seems to run counter to the typical SRBI process. As explained in the Connecticut Department of Education's 2010 Guidelines for Identifying Children with Learning Disabilities (the "Guidelines"), "[i]nterventions in the SRBI process are relatively short term, typically eight to 20 weeks in duration per tier of intervention."

The Board errs by focusing almost exclusively on whether K.M. made any progress at all with SRBI.  For example, the Board argues:  "Because the objective evidence demonstrated that [K.M] was making progress through the Board's RTI process, the Board had no basis to find [K.M.] required specialized instruction (i.e. an IEP)."  Doc. 44, at 18; *see also id.* at 22 (the information presented at the PPT "demonstrated that [K.M.] was making progress with SRBI: she had met SRBI benchmarks by moving from F&P Level B (end of Kindergarten), to a Level D (in November 2011), to a Level F (in February 2012), and then to a Level H (in May 2012).").  However, this ignores the "dual discrepancy" language relied on by the Board, which refers not just to progress, but to "*sufficient* progress."  34 C.F.R. § 300.309 (emphasis added).  This is especially significant because, as explained by reading specialist Matera, a student like K.M. should aim for higher rates of progress relative to her peers so that she can close the achievement gap brought about by her diagnoses:

> [I[f she's making slow progress and they're making slow progress, or they're both making moderate amounts of progress, that gap between her and her peers is not going to close, unless she receives a more intensive instruction, much more intensive instruction than her peers, so she needs to catch up again.  Maybe that's the best way to explain that, closing the gap, is to catch up to her peers, so we don't want her just to make progress.  We want her to meet benchmarks and grade level requirements.

Matera Tr. at 48.

Regardless of whether the foregoing establishes that SRBI was completely unsuccessful, it entirely contradicts the Board's assertion that the PPT could have had *no suspicion* that K.M. was insufficiently progressing through SRBI (and thereby could not have had a specific learning disability).  At best, the Board only established that K.M. made some progress during SRBI, without showing such to be "sufficient progress" obviating the need for a comprehensive evaluation.  The fact that the PPT made such a summary determination in light of a psychological report expressly

diagnosing K.M. with a learning disability further and seriously undermines the Board's position. In short, the Board has not demonstrated that it could have had no suspicion that K.M. was making insufficient progress through SRBI.  Therefore, the Board errs in its argument that it was not compelled by the IDEA to evaluate K.M.

In its argument to the contrary, the Board also places heavy reliance on the Connecticut Department of Education's Guidelines.  As the Board describes, those Guidelines do state expressly that a "PPT may determine that a comprehensive evaluation is not needed," if it concludes "through analysis of data that documents a student's progress through the use of appropriate, technically adequate assessments, that a student is making sufficient, adequate progress through SRBI." Guidelines, at 26; *see also id.* at 27 ("It is possible that based on a review of existing data, the PPT will have sufficient information to determine if the student has a disability. . . .  This review of existing data may qualify as the comprehensive evaluation.").  These Guideline provisions, which speak in general terms of possibility, do not assist the Board.  Each case turns on its own particular circumstances.  In the case at bar, the Board should have had a suspicion that K.M. was in fact not making sufficient progress through SRBI.

The Court also notes that to the extent the Board asserts that one evaluative tool—SRBI/RTI—served to circumvent any need for comprehensive evaluation of K.M., it failed to adhere to IDEA procedure.  *See* 34 C.F.R. §§ 300.304(b) ("In conducting the evaluation, the public agency must . . . [u]se a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child," and "[must] not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability."); 300.306(c)(1)(i) ("[i]n interpreting evaluation data for the purpose of determining if a

child is a child with a disability . . . each public agency must . . . [d]raw upon information from a variety of sources").  According to U.S. Department of Education guidance:

> an evaluation of a child suspected of having . . . a specific learning disability, *must include a variety of assessment tools and strategies and cannot rely on any single procedure as the sole criterion for determining eligibility . . . .. **An RTI process does not replace the need for a comprehensive evaluation**, and the results of an RTI process may be one component of the information reviewed as part of the evaluation procedures required under 34 CFR §§300.304 and 330.305.*

Ltr. to Dr. Zirkel, 47 IDELR ¶ 268 (OSEP Mar. 6, 2007) (all emphases added).

In light of the above, the Court has little difficulty in determining that the Board failed to adhere to the procedural requirements of the IDEA, specifically, the Child Find obligation of 34 C.F.R. § 300.111(c)(1).  Although not all procedural violations of the IDEA amount to the denial of a FAPE,[19] this one clearly does.  Here, the Board prematurely and improperly cut-off the disability review process.  If that were found not to be a procedural violation amounting to the denial of a FAPE, it is unclear which procedural violation could so qualify.  Specifically, the Board's refusal to evaluate K.M. not only impeded Parents' opportunity to participate in the decision-making process, it foreclosed them from accessing that process at all, a process to which they were entitled.  *See M.A. v. Torrington Bd. of Educ.*, 980 F. Supp.2d 245, 270 (D. Conn. 2013) ("The Board's 'refusal to continue the process for [M.A.], a resident of Torrington, constituted a denial of FAPE." (internal quotation omitted)).

The Court therefore holds that the IHO's determination that "the PPT erred when, without

---

[19] "Procedural violations . . . only [entitle the parents to reimbursement] if they impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decisionmaking process, or caused a deprivation of educational benefits.  *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (internal quotation omitted).

evaluating the Student, it summarily deemed her ineligible for special education and related services," Order, at 7, is supported by a preponderance of the evidence.[20]  For the reasons discussed above, the Court finds this error sufficient to demonstrate a denial of a FAPE for the 2012-13 academic year.  The first element of the *Burlington/Carter* test is satisfied.[21]

### 2.    IHO's Determination That Windward was an Appropriate Placement

To be eligible for reimbursement under the IDEA, Parents must have established that Windward was an appropriate placement for K.M.:

> [U]pon a finding that a public agency's placement or program or proposed placement or program is not appropriate, any party seeking reimbursement for a unilateral placement or program shall prove the appropriateness of such placement of program by a preponderance of the evidence.

Regs. Conn. State. Agencies § 10-76-14(c).  A unilateral private placement is only appropriate if the "'placement provides 'educational instruction specially designed to meet the unique needs of a [disabled] child, supported by such services as are necessary to permit the child to benefit from instruction." *C.L v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014) (quoting *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 365 (2d Cir. 2006), which, in turn, quoted *Rowley*, 458 U.S. at 188-89).[22]  "In making this determination, courts look to the 'totality of the

---

[20]  Put differently, the Court holds that the IHO correctly answered "Yes," to the first issue presented to her: "Did the Board err in concluding that the Student was ineligible for special education services for 2012-2013 school year?"  Order, at 1.

[21]  The IHO's subsequent and independent determination that K.M. was in fact disabled is discussed below.

[22]  The Board initially phrases the standard somewhat differently.  Quoting *Hardison v. Board of Education*, 773 F.3d 372, 386 (2d Cir. 2014), it determines that the placement is only appropriate if it is "*specifically* designed to meet the unique needs of handicapped children," rather than "specially" designed to meet those needs.  Doc. 44, at 33 (emphasis in original).  The *Hardison* court borrowed the term "specifically," from *M.H. v. N.Y.C. Department of Education*,

circumstances' and '[n]o one factor is necessarily dispositive.'" *M.B. ex rel. L.C. v. Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 78 (2d Cir. 2013) (quoting *Frank G.*, 459 F.3d at 364).  In short, the "parents' placement of the child must be reasonably calculated to enable the child to receive educational benefits." *C.L.*, 744 F.3d at 836.  Finally, "'the test for the parents' private placement is that it is appropriate, and not that it is perfect.'" *Regional Sch. Dist. No. 9 Bd. of Educ.*, 2009 WL 2514064, at *14 (quoting *Warren G. v. Cumberland Cnty Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999)).

As proffered by Parents, K.M. has above-average intellectual ability, but has a language-based learning disability affecting her reading skills.  Windward advertises itself as a school specially designed for that precise type of student.  Specifically, it states that "Windward students are children of average or above average intelligence who may have not been able to achieve language competency in traditional classroom settings."  P-40, at 1; *see also id* (Windward is a "school focused exclusively on helping students in grades 1-9 with language-based learning disabilities.").  Windward then determined that K.M. specifically met its criteria for admission precisely "because she has a language based learning disability."  P-47, at 4; *see also* P-40, at 5 (describing Windward admissions criteria to include a "written diagnosis of a language and/or learning disability," "average to superior intellectual potential," and "no behavioral or emotional problems").  Windward expounded as follows as to the appropriateness of its program to K.M.:

---

685 F.3d 217, 246 (2d Cir. 2012), which in turn quoted the term from *Gagliardo v. Arlington Central School District*, 489 F.3d 105, 115 (2d Cir. 2007).  *Gagliardo*'s use of the term "specifically," however, is a misquotation of the Second Circuit's earlier decision in *Frank G.*  Specifically, in *Frank G.*, the court used the term "specially," rather than "specifically," which was a proper quotation of the Supreme Court's decision in *Rowley*.  Given that the Second Circuit has vacillated between "specially" and "specifically," and that the initial use of the term "specifically" was in error, the Court will apply the Supreme Court's usage of "specially" from *Rowley*.

> [K.M.] is a child with a language based learning disability. Windward is a school of highly trained teachers who have been trained to teach children with language based learning disabilities through a multisensory direct instruction group model.

P-47, at 4.[23]

Windward's description of "Windward students" mirrors the description of K.M. in the report issued by Parents' retained expert, Dr. Greenberg.  B-3, at 15 ("Despite strong, evenly developed cognitive functioning, intensive intervention at school and tutoring at home, [K.M.]'s reading skills fall well below the expected level for her age.").  In addition, Dr. Greenberg's report specifically recommended K.M. attend a school offering the precise type of program advertised by Windward:

> A specialized school for children with reading differences and learning disabilities is an appropriate placement for [K.M.].  Whereas at the present time she is embarrassed by her struggles and concerned about her learning differences, in the presence of students who struggle as she does she may feel liberated from her shame and despair.  With those specific anxieties reduced [K.M.] will be more available for learning, may demonstrate fewer signs of ADHD, and may develop the necessary tolerance for frustration and hard work that will be required for her to learn to read.

B-3, at 19.  It should be no surprise, then, that Dr. Greenberg, who has no connection to Windward, later testified at the due process hearing that Windward is "a great choice for [K.M.]" specifically because "[i]t's a great school for kids who do not have behavior problems, who are bright and really struggling to learn to read."  Greenberg Tr. at 60.  Dr. Greenberg continued:

> my hope would be that in a small group setting [like at Windward] where there's lots of reinforcement all day long in literacy, because that's the focus all day long. . . .  At the same time, they're [Windward] really focusing on the emotional piece because they know kids who are – who have learning disabilities have emotional

---

[23]  Although Parents failed to proffer the live testimony of any Windward personnel, the record establishes that Parents were contractually prohibited from securing such testimony.  P-10.

-26-

> vulnerabilities as well, so their program is nicely set to address that throughout the day. . . . [T]here's a concerted effort at Windward to teach kids not just self-advocacy skills, but to know who they are as learners with a learning disability.

Greenberg Tr. at 60-61.[24]  Matera, a reading specialist familiar but unassociated with Windward, also testified that Windward "is a most appropriate placement" for K.M.  Matera Tr. at 19.  Specifically, it was her opinion that:

> Knowing the various LD schools in the area, knowing what types of students they take, and what kind of success they have over the years, I think Windward is the most appropriate compared to the other LD schools in the area. . . .  Windward's program is a very intensive language arts block, so she'll, instead of having, you know, one language arts block per period, she might have three or four that are broken up into these areas of, you know, phonemic awareness, phonics, maybe fluency, and then building her reading level over time.  So it's a very intensive program, based on struggling readers.

Matera Tr. at 19-20.

The Board rests its argument principally on the notion that Parents offered no evidence as to K.M.'s specific academic program at Windward.  In so arguing, the Board calls for too heavy a burden on Parents to establish the appropriateness of Windward.  To be reimbursable, the program need not be individually crafted for K.M. herself, but rather should be specially designed to meet K.M.'s needs.  In other words, Parents' needed to show that "placement of [K.M.] [was] reasonably calculated to enable the child to receive educational benefits."  *C.L.*, 744 F.3d at 836.  For the reasons discussed above, Windward's program was clearly designed to address the special needs of students specifically in K.M.'s circumstance and is thereby "reasonably calculated to enable [her] to

---

[24]  Dr. Greenberg also testified that there are not many options for schools that provide the services of Windward.  Greenberg Tr. at 75 ("there's slim pickin's around here, so the choices are Windward and Eagle Hill").

receive educational benefits." *Id.*

It is noteworthy that despite the Board's assertion that "[c]ase law supporting [it's] position on this point is overwhelming," Doc. 44, at 36, it has not proffered a single case in which a federal court overturned a finding that a private placement was appropriate. Rather, in each case to which the Board refers, the court was asked to *overturn* a finding by the ultimate state arbiter that a private placement was *not* appropriate. Those courts refused to do so, in large part relying on the deference owed to state educational authorities better situated to make the appropriateness determination. *See Hardison*, 773 F.3d at 386 ("A.N.H.'s placement at Family Foundation appears to have helped her with some of her psychological issues, [but] we nevertheless hold that the SRO's determination in this case is sufficiently reasoned and supported by the record to merit deference"); *id.* at 387 ("The determination made by the SRO here, that more particular information was required to reach a particular decision, is a function of the specialized knowledge and expertise possessed in greater degree by state educational policy-makers than by the courts"); *Gagliardo*, 489 F.3d 105 (reversing district court's reversal of an IHO's determination because it "reached its conclusion despite the fact that the IHO, confronted with the same evidence, found that Oakwood was not an appropriate placement for S.G.," and holding that "[i]n sum, the IHO's finding that Oakwood was not an appropriate placement for S.G. is reasoned and supported by the record"); *see also Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp.2d 514 (S.D.N.Y. 2011); *Doe ex rel. Doe v. East Lyme Bd. of Educ.*, 2012 WL 4344304 (D. Conn. Aug. 14, 2012).

Here, the IHO was confronted with persuasive and one-sided evidence from the private placement itself and from two experts in the field with knowledge of both K.M. and the private placement's curriculum and academic approach. All of that evidence demonstrates that Windward

is designed to assist children precisely sharing the characteristics of K.M., characteristics which K.M. was determined to possess following a thorough examination by an expert in the field, an expert who herself strongly endorses the private placement.  The Court also notes that the Board offered to the IHO no evidence, or even averment, demonstrating that Windward is for any reason inappropriate to K.M.'s needs.[25]  *See Matrejek v. Brewster Cent. Sch. Dist.*, 293 F. App'x 20, 22 (2d Cir. 2008) (affirming school district's determination that private placement was inappropriate in light of, *inter alia*, testimony that the private placement "did not provide the type of instruction and services recommended by the evaluators hired by the parents").  In light of the above, the Board simply has not shown that the IHO erred in determining that Parents demonstrated, by a preponderance of the evidence, that Windward was an appropriate unilateral placement in light of K.M.'s difficulties.

### 3.     Equities

The third prong of the *Burlington/Carter* test has the Court assess whether Parents can properly show that "equitable considerations favor reimbursement."  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014).  The IHO's decision makes no reference to an analysis of the equities.  However, neither does the Board.  It raised no argument as to the IHO's treatment of the equities in this case—either in its motion for clarification to the IHO or in its summary judgment papers to this Court.  Such argument should be deemed waived.  *See Palmieri v. Lynch*, 392 F.3d 73, 87 (2d Cir. 2004).  Nevertheless, the equities in this case clearly favor Parents.

---

[25]   The Court is mindful that parents have the burden of persuasion as to the appropriateness of a private placement, and that local education agencies are under no obligation to provide any affirmative evidence demonstrating the inappropriateness of a private placement. However, here, when confronted with Parents' credible demonstration of the specific appropriateness of the private placement, the Board cannot win without rebutting that showing.

There is no evidence that "the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA," and therefore "their pursuit of a private placement [is] not a basis for denying their tuition reimbursement." *C.L.*, 744 F.3d at 840. Nor can it be said that "parents unilaterally arrange[d] for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP." *S.W. ex rel. M.W. v. N.Y.C. Dep't of Educ.*, 646 F. Supp.2d 346, 364 (S.D.N.Y. 2009). In fact, the record shows that Parents did not begin the process of transitioning K.M. to Windward until after the PPT meeting closed the door on further review of K.M. J.M. Tr. at 125. Most importantly, the record is clear that Parents "consistently made good-faith efforts to resolve [K.M.'s reading] problem at her public school," and "[t]he record gives no sense that [Parents] . . . were anything less than fully committed to a public school education for [K.M.]." *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 878-89 (2d Cir. 2016). In fact, the record is replete with evidence that Parents, specifically J.M., put forth strenuous and untiring efforts throughout K.M.'s first-grade year to work closely with Riverside teachers, specialists, and administrators to ensure the progress of their daughter. Faced with what they felt was inadequate progress following intervention, they retained the services of a trained school psychologist, who evaluated their daughter and formed several diagnoses impacting her ability to succeed in school. Parents then took that report to the school administration, which in large part ignored it for all relevant purposes. Only upon learning of the Board's summary refusal to even evaluate K.M. upon receiving notice of her diagnoses did Parents genuinely begin the process of seeking alternative avenues for K.M.'s education. In light of the foregoing, the balance of equities tips decidedly in Parents' favor.

In light of the foregoing, that the *Burlington/Carter* test was satisfied is supported by a

preponderance of the evidence.

## B.      IHO's Determination that K.M. is Disabled Pursuant to the IDEA

Apart from it's finding that the Board violated its Child Find obligation in failing to evaluate K.M., the IHO also affirmatively determined that K.M. suffers from a "specific learning disability" as defined at 34 C.F.R. § 300.8(c)(10) and that she is therefore entitled to special education and related services.[26]  The Board raises several arguments as to why the IHO's decision was improper: (i) the IHO failed to conduct a "dual discrepancy" analysis; (ii) the IHO erroneously relied on Dr. Greenberg's report as an evaluation for a "specific learning disability"; (iii) the IHO failed to determine that K.M. requires "specialized instruction"; and (iv) the IHO had before it no comprehensive evaluation of K.M.  The Court addresses these arguments in turn.

### 1.      Dual Discrepancy

At the outset, the Court notes that the Board's assertion that a student *must* be deemed "dual discrepant" to be disabled pursuant to the IDEA is not entirely apparent.  The Board claims that federal regulations require a dual discrepancy finding, but cites only to 34 C.F.R. § 300.309(a)(1) and (a)(2).  To the extent the Board reads this as a federal "dual discrepancy" requirement, its interpretation is spurious.  Section 300.309 only describes how a state agency "*may* determine that a child has a specific learning disability."  *See also* 20 U.S.C. § 1414(b)(6) ("a local educational agency *may* use a process that determines if the child responds to [SRBI]").  It does not say that this

---

[26]  The Court notes that this Ruling seems to have been unnecessary, given the finding of the Child Find violation.  The issues before the IHO were only (i) whether the Board erred in determining K.M. ineligible for special education for the 2012-13 academic year; and (ii) the appropriateness of Windward.  Those issues were resolved in Parents' favor in full in light of the finding that the Child Find obligation was violated.  The Court addresses it here only for the sake of completeness.

is the *only* way in which it may do so.  In other words, § 300.309 is a source of affirmative authority to a PPT, not a limitation.  In fact, one court has expressly stated that the present iteration of the IDEA "does not require school districts to use an alternative [to the previously-mandated 'severe-discrepancy'] model to determine whether a student has a 'specific learning disability,'" although "it expressly permits use of the 'response to intervention model." *Michael P. v. Dep't of Educ.*, 656 F.3d 1057, 1060 (9th Cir. 2011).  Further, although the Board is correct that "the legislative history of IDEA 2004 [implementing the current version of § 300.309] supports the use of RTI," it fails to note that the purpose of the endorsement of the RTI approach was to alleviate issues created by "the 'severe-discrepancy' model [which] *tends to under-identify children with below average intelligence*," and that "education experts have criticized the [severe-discrepancy] model as unreliable, invalid, easily undermined, and harmful *because it delays early treatment*." *Michael P.*, 656 F.3d at 1061 (emphasis added).  It is therefore apparent that the amendment incorporating the RTI model was meant to broaden, rather than limit, a local education agency's ability to identify disabled children.

Moreover, the language of § 300.309 cannot be read to impose a requirement that a student insufficiently progress through SRBI prior to a disability finding.  The second-prong of the purported "dual discrepancy" requirement, § 300.309(a), can be satisfied in two ways, one of which does not involve SRBI at all.  Specifically, § 300.309(a)(2)(i) envisions lack of progress following SRBI, however, § 300.309(a)(2)(ii)—an alternative, but sufficient, manner in which a student may meet the standard of disability under this subsection— contains no reference to SRBI.  Therefore, despite Connecticut regulations purporting to require use of SRBI, *see* Regs. Conn. State Agencies § 10-76d-9(b)(1) and the Guidelines, federal regulations expressly determine that a PPT "may determine that

a child has a specific learning disability" by means other than SRBI.   Although 34 C.F.R. § 300.307 states that a "public agency *must* use the state criteria adopted . . . in determining whether a child has a specific learning disability," it also requires that the adopted state policies be "consistent with § 300.309."  That section affirmatively authorizes the manners in which a PPT "may determine that a child has a specific learning disability."  It is therefore unclear whether Connecticut's regulatory requirement that a PPT use SRBI to make a disability determination conforms with the IDEA.

Nevertheless, assuming, *arguendo*, that a "dual discrepancy" finding through SRBI is mandatory, the Board still has not met its burden of demonstrating that the IHO erred.

The Board is correct that the IHO made no mention of a "dual discrepancy" analysis, nor did she cite the components thereof.  In fact, the IHO's determination that K.M. is disabled is relatively sparse, and almost all contained within one paragraph:

> I therefore conclude, based on the strong evidence presented, including the Student's lack of progress in reading, Dr. Greenberg's report and credible testimony, and the credible testimony of Ms. Matera and Ms. McGowan, who identified the Student's lack of progress in November of 2011, that the Student suffers from a language-based disability that adversely affects her ability to learn and that requires specialized instruction.

Order at 8.  Noticeably absent is any reference to the federal or state statutory or regulatory criteria or procedure for determining whether a student has a "specific learning disability."

By failing to affirmatively refer to these criteria, this Court cannot be sure whether the IHO incorporated them into her conclusion.  However, such does not mandate automatic reversal of the IHO's decision.  It only requires more exacting review on the part of this Court to ensure that the IHO's ultimate decision is supported by a preponderance of the facts in the record.  In other words, summary decisions by IHOs are not disregarded, they simply receive less deferential treatment.  *See*

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (thoroughly examining case law on deference owed to agency decisions in IDEA suits and holding that "[d]eterminations grounded in thorough and logical reasons should be provided more deference than decisions that are not"); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) ("the deference owed [to state agency's decision in an IDEA case] depends on the quality of that opinion")**.**

Even crediting, *arguendo*, the Board's assertion that a "dual discrepancy" finding is required for a disability finding, the IHO's decision is supported by a preponderance of the evidence.  The IHO had sufficient evidence to determine K.M. was not adequately achieving to meet grade-level standards, nor was she doing so following SRBI.  As discussed in detail above, K.M. regressed from on-grade level to below-grade level in certain respects following SRBI, leading to a concern that even several Riverside personnel expressly acknowledged in front of the IHO.  Further, Dr. Greenberg and Matera, who both evaluated K.M. after months of SRBI, expressly noted that K.M. was not on-grade level, and in fact was well below it.  Both specialists also opined that the evidence principally relied on by the Board to demonstrate K.M.'s progress—notably her improvement as to a list of "sight words"—is better explained by K.M. adopting strategies that would increase her resulting score without her acquiring the sought-after skills.  The IHO found all of this testimony credible, a fact made express in her decision.  The Court has no basis in the record to make a determination otherwise.  Therefore, that K.M. was in fact "dual discrepant" is reflected by a preponderance of the evidence.  Finally, the Board makes no argument that K.M.'s learning difficulties are "primarily the result of . . . [a] visual, hearing or motor disability; [m]ental retardation; [e]motional disturbance; [c]ultural factors; [e]nvironmental or economic disadvantage; or [l]imited English proficiency."  34 C.F.R. § 300.309(a)(3).  Therefore, that K.M. met the disability

standard proffered by Connecticut regulations (and the IDEA) is supported by a preponderance of the evidence.

### 2.     Reliance on Dr. Greenberg's Report

As discussed above, the Board argues that it was error to rely on Dr. Greenberg's report, principally because Dr. Greenberg did not apply the requisite standards under the IDEA and Connecticut law to find a "specific learning disability."  This argument is without substance, for several reasons.

*First*, the Board errs in arguing that Dr. Greenberg's report was the "sole basis" for the IHO's determination that K.M. was disabled.  As stated in the Order, and as discussed above, the IHO also properly relied on (i) K.M.'s "lack of progress in reading," (ii) Dr. Greenberg's testimony; (iii) Matera's testimony; and (iv) McGowan's testimony.

*Second*, relatedly, to the extent Dr. Greenberg did not apply or incorporate IDEA standards into her assessment, it is of no moment.  It was up to the IHO to determine that Dr. Greenberg's findings, along with the other testimony and evidence relied upon, met the findings of a disability under the IDEA.  That is what she did.

*Third*, the Board also errs in arguing that Dr. Greenberg's report was solely "predicative" [*sic*].  Doc. 44, at 30.  Dr. Greenberg's report makes clear that K.M. was then currently suffering from a learning disability, was then currently well behind her peers in her reading skills in light of that disability, and was then currently in need of more aggressive and specialized intervention.  Dr. Greenberg's predictive assessment, or, in language relied on extensively by the Board, her "crystal ball" assessment, was simply that K.M.'s currently documented deficiencies will broaden into even more areas if not addressed.  *See* Greenberg Tr. at 58 (testifying that although K.M.'s reading

*comprehension* is now sufficient, her current deficiency in reading *fluency* will ultimately effect her comprehension ability).

### 3.    Specialized Instruction

The Board argues that the IHO erred by "mak[ing] no mention whatsoever of the need for specialized instruction," a required component of a disability finding under 34 C.F.R. § 300.308(a)(1).  Doc. 44, at 31; *see also id.* at ("the IHO entirely fail[ed] to address this element of eligibility").  The Board is wrong.  The IHO specifically concluded that K.M. "suffers from a language-based disability that adversely affects her ability to learn and that requires specialized education." Order, at 8.  Moreover, this conclusion was amply supported by a preponderance of the evidence, notably, the testimony and reports of Dr. Greenberg and Matera.  *See*, *e.g.*, Matera Tr. at 182 (there is "no doubt that there needs to be some direct instruction for the language-based reading disability").    Additionally, Riverside itself acknowledged that K.M. required at least some specialized intervention through SRBI, and that such specialized instruction needed to be increased after only a few months of SRBI.  Although the Board cites certain cases finding an insufficient showing as to whether the student required specialized instruction, those cases each deferred to the agency's first-instance decision finding a lack of specialized instruction.[27]  Here, the IHO's decision was supported by a preponderance of the evidence before her.

### 4.    Comprehensive Evaluation

The Board argues that because the IHO determined that the Board should have conducted a

---

[27] The Board does cite to *Marshall Joint School District Number 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 637 (7th Cir. 2010), where the Court overturned an ALJ's decision that a student was disabled pursuant to the IDEA.  There, however, the Court found that the student's health condition did not "adversely affect his educational performance,"and therefore it had no need to address the question of the need for specialized education.

comprehensive evaluation to determine if K.M. was disabled, she herself could not have found him disabled without such an evaluation being performed.  This argument—that which is good for the Board's goose must be good for the IHO's gander—misses the mark.  It strains credulity to imply that the IDEA requires a clearly disabled child to go through a perfunctory comprehensive evaluation, or, worse yet, that parents of an obviously disabled child may be stripped of IDEA benefits if their child was determined to be disabled without a comprehensive evaluation.  Such a notion is squarely "at odds with the general remedial purpose underlying IDEA." *Forest Grove*, 557 U.S. at 244.  It is also at odds with its language, which only requires evaluations of students "suspected of" being disabled, 34 C.F.R. § 300.111(c)(1), not those known to be so.

The Board has failed to meet its burden to demonstrate that the IHO's finding of K.M. disabled pursuant to the IDEA is not supported by a preponderance of the evidence.

### C.   IHO's Award of Remedies

Finally, the Board argues that the IHO improperly awarded reimbursement to Parents for the entire tuition paid to Windward for the 2012-13 academic year.  The Board's argument is essentially that Parents requested reimbursement, rather than prospective relief, and that therefore they only could be reimbursed for money spent prior to the January 3, 2013 issuance of the IHO's decision.

This argument is without merit, again for a number of reasons.

*First*, the remedy ordered by this Court is not limited to whichever terminology Parents may have used in requesting their relief.  *See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 170 (2d Cir. 2014) ("The IDEA provides district courts with broad discretion to 'grant such relief as the court determines is appropriate' in order to carry out its statutory mandate. 20 U.S.C. § 1415(i)(2)(C)(iii)."); *L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*, – F.3d –, 2016 WL 2942301, at *22

(2d Cir. May 20, 2016) ("Courts retain broad discretion in fashioning an award, restrained only by the Supreme Court's directive that 'the relief is to be 'appropriate' in light of the purpose of the act'" (quoting *School Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985)).

*Second*, the Board's argument appears to assume that the Parents had not already paid the full year's tuition at Windward by the time of the IHO's decision, when the record strongly indicates otherwise. The Windward contract states that Parents were to have paid the full $46,700 yearly tuition under Windward's "One Payment Plan," whereby the total amount was due by July 15, 2012. Doc. 26-3, at 11. Upon executing that agreement, Parents acknowledged that their "obligation to pay the tuition for the full academic year is unconditional and that no portion thereof will be refunded or canceled despite the subsequent absence, withdrawal or dismissal of the student from the School for any reason whatsoever." Doc. 26-3, at 10. Moreover, K.M.'s enrollment at Windward is a clear indication that Parents made such payment (and, nothing in the record would show that they did not do so). Therefore, given that parents had already paid the amount that the IHO ordered as a remedy, and that they had no way of recovering said amount from Windward, that remedy is properly characterized as "reimbursement." *See* Merriam-Webster ("to pay back to someone").

*Third*, conversely, an award covering the 2012-13 academic year cannot constitute "compensatory education" as envisioned by the IDEA. "'Compensatory education' is prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education." *Somoza v. N.Y.C. Dep't of Educ.*, 538 F.3d 106, 190 n.2 (2d Cir. 2008) (emphasis added). Parents only argued that K.M. was eligible for the 2012-13 academic year, and, in fact, they expressly withdrew their claim as to the

2011-12 academic year, Dec. 4, 2012 Tr. at 63.  Therefore, there is no alleged "earlier deprivations in [K.M.]'s education" for which a remedy could compensate.  It is therefore clear that the IHO's order that the Board pay Parents the amount Parents spent on tuition at Windward for the 2012-13 academic year was properly ordered reimbursement.

## IV.     Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [Doc. 43] is DENIED, and Defendants' Motion for Summary Judgment [Doc. 45] is GRANTED.  The Clerk of Court is directed to enter judgment for Defendants.[28]

**It is SO ORDERED.**

**Dated: New Haven, Connecticut**
**        June 22, 2016**

*/s/   Charles S. Haight, Jr.*
**Charles S. Haight, Jr.**
**Senior United States District Judge**

---

[28]   The Defendant Parents are the prevailing parties in this action Plaintiff Board brought under the IDEA.  The Act provides: "In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs – (I) to a prevailing party who is the parent of a child with a disability; . . ."  20 U.S.C. § 1415(i)(3)(I); *see Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006).  Defendants' present submissions do not include an itemized statement of costs for which they claim statutory reimbursement.  In a claim for costs which includes attorneys' fees, the claim for attorneys' fees must comply with the Second Circuit's directions in *New York Ass'n of Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).  If Defendants in the case at bar are disposed to file a claim for costs, they must do so not later than July 29, 2016.  Plaintiff is entitled to oppose a claim for costs, in whole or in part, and must file opposing papers within 14 (fourteen) calendar days of the service of Defendants' claim upon them.